Please be seated, everybody. Okay, if the attorneys would argue, please step forward, state and spell your names. My name is Michael Lovelace. I represent Jimmy Dunlap, the appellant in this case. My name is Curtis Lovelace, L-O-V-E-L-A-T-E. Can you go about checking the half of the people? Last name spelled P as in Paul, I-W-O-W-A-R, C as in Charlie, Z as in Zebra, Y-K. Common spelling? Common joke. Well, thank you. You each have 20 minutes, as you know, and you don't have to use it all. Are you reserving? Yes, sir. How much are you going to reserve? Five. Okay. Now, and the microphone is for recording only, so keep your voices up so everybody can hear you. Thanks. Okay, whenever you're ready. Good afternoon, Your Honors. Again, Kirk Lovelace, representing the appellant in this case, Jimmy Dunlap. There's no doubt that D'Andra Dawson was brutally murdered in April of 1992 in her apartment in Evanston, Illinois. Jimmy Dunlap, the defendant and appellant, did know D'Andra Dawson in April of 1992 and, in fact, did have sex with her during that same month. Also in April of 1992, Jimmy's wife- We know all the facts are in your briefs and in the record. But as you know, and you don't disagree, that we can't set aside a conviction unless the evidence is so unreasonable or improbable as to raise a reasonable doubt of the defendant's guilt. It seems to me that you're just complaining about the result, aren't you? Where is the evidence so unreasonable and improbable? I think there are a couple of factors, Your Honor. I think the most important thing is the evaluation of the DNA evidence on the knife. In this case, first let me just step back. There was DNA evidence indicating that Jimmy Dunlap did have sex with D'Andra Dawson. That is what led to his arrest in 2013. Then there was a significant delay between the date of arrest and the trial, which is in 2016. A review of the record would indicate that there were multiple continuances to test more of the evidence. And what the record indicates is that the state was collecting evidence to strengthen what was an extremely weak case, which was based solely on the fact that Jimmy Dunlap had sex with D'Andra Dawson and had denied it. During that time period, they collected or they evaluated evidence as far as DNA. Don't you see that all they had when they arrested him was his DNA in her body? Didn't they have the DNA on the knife? I don't believe so, Your Honor. I believe in reviewing the record as far as the testimony from the arresting officers, they arrested solely based upon the fact that there was DNA in the form of semen. They testified to that. There was no indication in the record to show that they confronted Jimmy Dunlap with, hey, how did your DNA get on the knife? Clearly, they confronted the issue of, you know, you had sex with D'Andra Dawson. Right. And you're saying that there was a substantial period of time before they got the DNA off the knife? I know there was. I'm trying to figure out what the problem is. If the problem was they arrested him based on the DNA on the semen and he didn't go to trial for a long period of time, what does that have to do with the evidence introduced in his conviction? Well, I think it has to do with the weaknesses in the state's evidence in the sense that, again, maybe they did. There's no indication in the record that they had the DNA on the knife matching or the DNA not able to exclude Jimmy Dunlap. At least the officers didn't confront him with that. He was only confronted with the issue. Maybe they had that, but, again, I don't have that information in the record. I have reviewed the discovery, but I suspect the court doesn't want to hear what I have to say about the discovery in the case because not all that would be in the record. We're all interested in anything you have to say that deals with the issue you raised on appeal, that he was not proven guilty beyond being brought up. So go ahead. Well, again, in this three-year period after the arrest and to trial, there were multiple continuances and items that were tested and retested using different methods. As far as the DNA on the knife, first there was just what I would call a normal DNA test that identified one male donor and a female donor, the female donor being Deondra Dawson, and then a male donor to the DNA on the knife. That comparison could not exclude Jimmy Dunlap. However, the frequency calculated was that there was a possibility that one in 2,000 black individuals, one in 2,700 white, and one in 3,500 Hispanic unrelated individuals could not be excluded from contributing to that DNA profile. So not particularly strong evidence in this case. However, then what occurred afterwards or after that initial test was done, there was a Y-chromosome DNA test conducted in order to evaluate, again, that same profile. Now, using that method, which only identifies male DNA, there were actually two male DNAs identified on the knife, a male and a minor profile, and the major and a minor. The major male, again, Jimmy Dunlap could not be excluded. Again, there were statistics offered as far as that occurring in one in 2,000, one in 2,000 in African American, one in 28 unrelated Caucasian males, and one in 1,300 unrelated Hispanic males, and that was based upon a 95% confidence limit. And then what the expert in this case testified to was that she combined those results of the Y-chromosome or amplified analysis with the previous analysis to increase the probability that the DNA of Jimmy Dunlap matched the DNA found on the knife. And her math then showed that one in 4 million African Americans, one in 7 million Caucasians, and one in 4.5 million Hispanic unrelated individuals could not be excluded. Now, was that challenged by the defendant at trial or in a post-trial motion, or did it go wholly unrebutted? It went wholly unrebutted. And again, there was no evidence offered by the state as to whether or not that math calculation was appropriate in this case. There was no foundation laid. It was just that that expert says, here's what I did. I combined the two, and here's what my math shows us. And again, that is the strong evidence that then the state offered to support this conviction. And I'm stuck with the record here. So it is, and to this day, I'm not aware of whether or not this math is correct or not. I have not consulted with an expert in whether or not you can combine the traditional results from a DNA with the newer, more amplified Y chromosome testing. But why is the evidence so unreasonable or improbable? I'm trying to get a handle. I mean, you're saying all these things. Sure. But then where are we? Well, in this case, there was no eyewitness. But that's okay. And I understand that. You're saying it boils down to the knife DNA. I mean, basically, you're questioning because there is another male there on that knife that we don't know about. Right. There's another male. And in addition, there was some other testing that was done. The state seemed to focus on two individual items of a multitude of items collected in this Evanston apartment. There was an immense amount of blood. It would appear that there was a significant struggle. It was a brutal murder. Deondra Dawson was stabbed over 80 times. She even had a bite mark on her cheek. So this wasn't exactly a clean murder. So the idea that Jimmy Dunlap only left this single DNA on some crusted blood on this knife and it appeared nowhere else in the apartment. They did test. There were two items. There was the knife, and then also there was a decorative fork that had been broken during the attack into multiple pieces. Those four pieces were tested both in a traditional method and also the Y chromosome. And there were mixed results identifying male DNA on certain pieces of that fork in different areas. I hear what you're saying, but what are you asking us to do? I mean, are we supposed to make some kind of determination about DNA evidence? Where are we going with all this? How can we, with what's before us, say that what the judge did is not appropriate based upon what we have before us? You said you've got one hand tied behind your back because of that, and we realize that. And you've made cogent arguments here, but when you get down to it, again, why can't we accept what the judge said with regard to the DNA based upon what we have before us? The DNA alone, again, I think presents problems, and maybe it's an ineffective assistance of counsel argument later on based upon evidence that is not before us when it comes to the DNA. However, in reviewing the record, there doesn't seem to be any explanation of how you can combine these two testing methods to come up with a stronger number to convict Jimmy Dunlap. So are you kind of equating the statistical probability or lack of it with a reasonable doubt? Yes, yes. I am equating that, Your Honor, as well as I do have concerns about the method or the decision of the judge in this case based upon credibility. And I do realize the judge in this case and not this court is the one who judges credibility. There were only a couple of witnesses presented by the defense in this case, one of which was Jimmy Dunlap. He did testify. And Jimmy admitted that he did have, for the first time in court, have sex with Deondra Dawson. And the judge did. When the investigators had questioned him, he denied it and denied it, even though he was separated. So, I mean. Correct. There's a question about that. And he did give an explanation, and the judge did not buy the explanation. Which he doesn't have to. Which he doesn't have to. But if that is then used to impeach him, then it just cancels out his testimony and it doesn't strengthen the state's case against him. The other thing that concerns me about not accepting that explanation is if you look at the record, although he denied, he was first approached with this issue in 2012, June of 2012. And he was questioned by the Edison Police Department in this cold case investigation. And at that time, he was asked whether he had sex with Deondra Dawson. He denied it. But at the same time, he freely gave up his DNA. But he also denied even knowing her, correct? Correct. And then at trial, he testified that not only did he know her, but he lived in the same building as she did. And coincidentally, he had sexual intercourse with her within three days of her death, which happened to be the same estimated time of the life of the DNA in the sperm.  Coincidentally. So are those things that the trial judge should have ignored, not considered, or given no weight to? Well, I think that the court can always look at circumstantial evidence and put those pieces together. Coincidentally, when it comes to the knife, Dana Dawson testified. And again, Dana Dawson, this is 20 years later. They are separated. They're still married, but separated. So she has no allegiance to Jimmy. But she testified that coincidentally, Deondra Dawson had been over the week prior to their apartment with her son. She had braided Deondra's hair. And then they had a small birthday celebration for Maurice. And coincidentally, Deondra brought a cake in which she didn't have a knife. She asked for a knife. And again, I think that provides an explanation as to potentially why there would be DNA on the knife in that case. Again, we're having to put things together circumstantially. But the judge did that also in coming up with his decision to convict. Getting back to the lies, the law is that false exculpatory statements can be used as probative evidence of consciousness of guilt. So couldn't a court take that into consideration? Wouldn't it be appropriate? It is. And I am stuck with that, Your Honor. It would be considered a false exculpatory statement. But again, that's just one thing the court looked at. The court did mention consciousness of guilt in making his decision, but seemed to then focus solely on the credibility of the defendant in this case. Your time's about up, but you've reserved five minutes. Do you have anything else? Do you have anything you want to say now? No, I'll just wait for reserve. Thanks very much. Thank you. May it please the court. Strong physical and circumstantial evidence established that the defendant had sex with the victim, then slashed her throat and stabbed her to death. The defendant's DNA was on the murder weapon mixed with the victim's blood. The victim was found naked, indicative of sexual intercourse between the victim and the defendant. There's no question about it. He admits that. So what they say, and what they close the reply brief with, is that all the evidence in this case taken together only establishes the defendant had sex with the victim. And that's basically what you just said. So the question is, and what they're saying, what they just said is, that's what convicted him, and that's not enough because he admits to that. What I mentioned was that the victim was found naked. She was found stabbed over 80 times naked, which is indicative that she had sex with her murderer, not just that she had sex. So the fact that it's only the defendant's DNA in the victim's vagina, it's only the defendant's DNA in the victim's anus, that points to the fact that he had sex with her. I thought it was three days before. So you're saying, oh, it had to be him. The testimony was within the three days. It wasn't. It was that day. So you're saying we shouldn't accept that? The judge didn't. The trial court rejected that testimony as completely unbelievable and coincidental that the defendant testified that he happened to have sex with the victim three days before she was murdered. I want to get back to the fact that his DNA was on the murder weapon, and I'm going to address some of the concerns that opposing counsel raised about that DNA testimony, but I think it's important to first just go through all of the evidence that was presented that doesn't just show that the defendant had sex with the victim, but that he had sex with the victim temporarily connected to when the victim was murdered. And that does go to the fact that the semen, the defendant's semen that was found in the victim's vagina had intact sperm in it, which, while that's possible. But didn't the expert say that it could be up to three days? She said it could be. She also said that she, and keep in mind, she was an agreed, there was no dispute about the fact that she was an expert in forensic biology and DNA analysis. She said it was possible but rare, and she said that out of 500 cases involving semen, only a handful had had intact sperm in her experience. And the trial court rejected the claim of the defendant that he had sex three days ago and found that that testimony from the expert was the more believable testimony, and the fact that time and movement would have damaged that sperm and prevented it from being intact, the trial court found that that pointed to the fact that the victim was murdered shortly after she had sex with the defendant. There were no signs of forced entry into the victim's apartment, leading the trial court to reasonably infer that the victim knew her murderer and let him in. The more than 80 knife wounds points to the fact that this crime was personal and not simply a burglary gone wrong after she had sex with someone else. And crucially, there are details from the victim's last phone call with her best friend that also point to the defendant. She didn't identify him in that phone call. She did not identify him in the phone call, and that's actually a key part of it because the victim told her best friend, Kelly Young, about every man that she had a romantic relationship with. This was the first time that she refused to tell her best friend who was coming over, and she told her best friend the reason she wouldn't tell the name of the person who was coming over was because Kelly knew him, because Kelly Young, the best friend, knew the person who was coming over that night. And we know from Kelly Young's trial testimony that she knew the defendant at that point of time as the boyfriend of another woman. It's also important to point out that in that conversation, the victim only mentioned expecting that one visitor that night to her apartment. She only mentioned that this one secret male visitor was coming over, which also makes that one visitor a prime suspect in this murder considering that there were no signs of forced entry in this case. With regard to the defendant's consciousness of guilt, it is absolutely clear that if the defendant only had sex with the victim, he had no reason to lie about it in this case. But he had sex with the victim, and then he killed her, so he lied about both. Those lies that he told served no purpose other than to avoid suspicion and deflect the investigation. He only at trial finally admitted to these constant lies that he told about not having sex with the victim and also never even being alone with the victim, which was not a lie about sex. It was a lie about his opportunity to commit this murder. With regard to the DNA evidence, opposing counsel concedes that the DNA evidence with regard to the defendant's DNA on the murder weapon was wholly unrebutted, and that is absolutely appropriate because the calculation that opposing counsel is referring to is DNA 101. Basically, it comes down to this. The frequency of two markers appearing together in a single individual is calculated by multiplying the frequency of the first marker with the frequency of the second marker. That has been the accepted math of the Illinois Supreme Court on DNA cases since People v. Miller in 1996, 173, Illinois second at 186. So we're talking about each chromosome having different locations that are looked at in analyzing DNA. And YSTIR looks at the Y chromosome. The traditional DNA testing look at other locations on other chromosomes. But the key is that each one of those locations, whether it's on the Y chromosome or another chromosome, the key is that those are independent genetic events. So the likelihood of any one of those markers appearing on any of those chromosomes is a specific frequency. And if you want to find out what the likelihood of somebody having both of those markers would be, you have to multiply the frequency. It's like taking the odds of getting a straight in poker and the odds of getting a flush in poker. And to figure out how much the odds are to get a straight flush, you have to multiply them. Now, is that in the record, this analysis you're doing? The explanation about how to multiply the two of them? Yeah, no, that's exactly what she explained. It's absolutely in there. The case that I cited, People v. Miller, which absolutely the Illinois Supreme Court discusses this multiplying of the frequency of different markers, that case is not cited in my brief because it had appeared from the opening brief of the defense that they had conceded that that was his DNA in the murder weapon. In the reply brief, it did appear that there were questions being raised about that. So I would definitely point to that case. But it's not an ineffective assistance of counsel issue because this is basic DNA. This is not something that the trial counsel needed to challenge. This is something that the trial court accepted and trial counsel accepted because it's just probabilities. It's basic math. The second male profile that the opposing counsel brought up in the YSTR testing, it's minuscule and it's irrelevant. It's minuscule because it was the minor male profile. The major male profile that was found in the YSTR testing matched the defendant perfectly at all 11 locations. The minor male profile was incomplete and it was not even in existence at the chromosomal locations that traditional testing looked for. So there was some Y chromosome there, but it was minuscule. And it's irrelevant because it was only on that crust of blood on the murder weapon. It wasn't in the victim's vagina. It wasn't in the victim's anus. It was that person's DNA was there. The only male profile in there is the defendant's semen. It's important, in fact, it's crucial to remember that even a reasonable hypothesis of innocence isn't sufficient. The people are not required to disprove every reasonable hypothesis of innocence. For 30 years, the Illinois Supreme Court has repudiated that particular mode of analysis. And we cannot consider any one piece of evidence in isolation. On review, the only question is whether any reasonable trial fact, viewing the evidence in the light most favorable to the people, could have found the defendant's identity as the murderer proven beyond a reasonable doubt. What about Maurice's, now his testimony at trial was just basically whatever he said before was correct. But when he was interviewed the two times after the crime, wouldn't he have been able to identify the defendant based on the fact that they lived in the same building and he hung around with his son? Or wouldn't he, and he said if he saw a picture he'd know. And all of those things point to the defendant. So first, he was shown a picture of all the other associates of the victim, and he didn't identify anyone. The person whose picture he wasn't shown at the time was the defendant, because the defendant's relationship with the victim was a secret. So he wasn't given an opportunity to identify him the way that he was given an opportunity to identify the other people who, or the other males who were associated with the victim. But it's also important to keep in mind that there's really no basis to place substantive weight on those prior statements to the police. The victim's son, Maurice Dawson, may have said, I told the truth to the police when I was four years old. But he did not acknowledge any of the specific statements that were later introduced for impeachment purposes through a detective who interviewed him at the time. And I want to make absolutely clear that just because those statements were made close to the time of the crime, and as the detective said, he thought that Maurice was an intelligent four-year-old, but that doesn't mean that those statements were necessarily reliable. Because that interview was not a forensic interview, it was not a victim-sensitive interview, it was not conducted by someone who was trained in child psychology to ask open-ended questions to ensure that words aren't being put into the child's mouth. This is a police interview. This is an Evanston detective at a police station questioning a four-year-old about a murder that he's investigating. So there are issues of reliability as to those initial statements, far beyond just whether or not he was an intelligent four-year-old or not. And I would present to Your Honor that the actual kernel of reliability in his testimony is exactly what the trial court identified. The trial court considered those prior statements, considered his testimony at trial, and said that he was giving weight to those things that were consistent across all of his statements. And that was that he was with his mother that night, that he was put to bed, that he woke up, that he came out, there was a man there, and that he was taken back to bed and told not to come out. Those are the key facts with regard to his testimony that the trial court rightly deemed to be reliable, and any theory that's based on the inconsistent portions of a four-year-old's memory really doesn't rise. It's a fanciful hypothesis of innocence. It certainly isn't even a reasonable hypothesis of innocence, not that that would even be sufficient. If there are no further questions, Your Honors, the physical and circumstantial evidence in this case proved the defendant's guilt, especially when viewed as it must be viewed, in a light most favorable to the people. For these reasons and those in our brief, we ask you to affirm the well-reasoned ruling of the trial court. Okay, thank you. Thank you, Your Honor. I just want to hit on a few points made by the State. First of all, as far as the DNA in the victim's vagina, I believe the record will reflect that Jimmy Dunlap's DNA was not the only DNA found there. So I think the record would show that the victim in this case had sex with multiple people. The DNA, the only DNA that obviously matched and became important to law enforcement and the State in this case was that that matched Jimmy Dunlap. The court has already pointed out some of the concerns that I put in my brief about Maurice. All that evidence came in. I don't believe there was an objection to it. I believe that the court can consider that evidence. I realize the State's argument that it was only used for impeachment purposes, therefore it's not substantive evidence, but I don't think the record ever differentiated any of that. I don't think there were any objections to any of the information that was found in the police report that the law enforcement officers testified, and so the court was well aware of Maurice's inability to identify Jimmy Dunlap at the time of the murder back in 1992. Maurice was interviewed twice. He was identified as an intelligent young man even for his young age, and that combined with Dana Dunlap's testimony that Maurice would spend time over at Dana and Jimmy's apartment, that Maurice would play with the Dunlaps, one of their sons, would indicate, at least circumstantially, that Maurice would be familiar with Jimmy Dunlap. He indicated that he would recognize him. Jimmy Dunlap didn't appear in any of the lineups, but if Jimmy Dunlap was the person there that night, there was a lot of contact, according to Maurice, between Maurice and the killer in this case, that he saw his mother and the person who would end up killing D'Andra dancing naked, that he was asked to go back to bed, that the individual, the male, actually put him back to bed and threw a Georgetown hat that he was wearing in the bedroom. So there was a lot of detail, but at no time did Maurice indicate, hey, this is, you know, I recognize this guy. He lives in the building, which then would have obviously led to Jimmy, if Jimmy was truly the killer in this case. As far as Kelly Young is concerned, her knowledge, she said that she knew Jimmy as the boyfriend of Dana. Well, I think her knowledge is pretty limited because it's not the boyfriend. Jimmy was Dana's husband. So I'm not sure that that lends any credibility or lends any strength to the case. As far as DNA 101, Your Honor, and the explanation provided by counsel, although I appreciate the explanation, that is not contained in the record. It's around 474 to 476 is where that witness testifies as to the Y chromosome testing, and then she just goes straight to her calculation. So there is no explanation as to whether or not that is appropriate to do or not appropriate to do, and therefore I believe this Court should disregard it. Isn't an expert allowed to testify as to their opinion without saying the basis, and it's up to the cross-examiner to bring out that the basis for that opinion is incorrect or faulty or renders the opinion not worthy of acceptance? An expert is not supposed to sit there and go line by line. Sure. But in this case, again, it was just a matter of testifying, okay, I took these results and did the math and it came up with these results without any explanation at all. Is an expert obliged to give a basis on direct examination? Yes. Under what rule? Well, there has to be some foundational requirement for the expert to come up with that calculation, and again, there's just nothing in the record to support that calculation. Does the Illinois rule of evidence provide for what you just said? I don't think so. I would agree, Your Honor, that the trial counsel should have objected or at least asked for foundation in this case so that we would have an adequate record that would explain, Your Honor. So you agree with my point that an expert doesn't have to give the basis on direct examination under the Illinois rules of evidence? Under the Illinois rules of evidence, they can rely upon certain things in coming up with their opinion, certain obviously hearsay documents, and they can rely upon their education and experience in coming up with their opinion. But again, I think it was just such a great leap to go from point A to point B without any explanation that this court should question that calculation. I believe that's all that I wanted to address. Okay. Okay. Thank you very much. Appreciate it. You did a great job, both of you, and you will be issuing something?